## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>

3SIXTY DUTY FREE & MORE HOLDINGS, LLC,

Petitioner,

v.

HOTEL SHILLA CO., LTD.,

Respondent.

</td><td>

Case No. 23 Civ. 6612

**PETITION AND MEMORANDUM OF LAW TO COMPEL ARBITRATION OR, IN THE ALTERNATIVE, APPOINT AN ARBITRATOR**

</td></tr>
</table>

1.      Petitioner 3Sixty Duty Free & More Holdings, LLC petitions this Court for an order under Section 4 of the Federal Arbitration Act, 9 U.S.C. § 4, compelling respondent Hotel Shilla Co., Ltd. to arbitrate disputed issues that are entrusted to resolution by an arbitrator under the parties' Securities Subscription Agreement executed as of October 25, 2019.  In the alternative, 3Sixty seeks a Court order under Section 5 of the Act, 9 U.S.C. § 5, appointing an arbitrator to resolve the parties' dispute.

2.      3Sixty operates airport duty-free and other retail stores and in-flight concessions. In October 2019, 3Sixty (then known as Travel Retail Group Holdings, LLC), which is controlled indirectly by Bernard Klepach, agreed to sell 44% of itself to Hotel Shilla, pursuant to the Securities Subscription Agreement.  After the start of the COVID-19 pandemic, the parties renegotiated the purchase price to provide for a portion of it to be paid under an "earnout" — *i.e.*, a provision allowing 3Sixty to obtain additional compensation in the future if the business achieved certain financial goals.  The amount of the earnout depended on 3Sixty's financial performance, as measured by EBITDA, in 2021 or 2022 — at 3Sixty's subsequent election.  If the parties were unable to agree on the measurement of EBITDA, the Securities Subscription Agreement provides

that their dispute be resolved through binding arbitration by the Ernst & Young accounting firm.

3.      3Sixty's audited financial statements showed EBITDA for 2022 in an amount that entitles it to the full earnout consideration under the parties' agreement.  Hotel Shilla has nevertheless disputed the amount of EBITDA.  Despite efforts to resolve their differences, 3Sixty and Hotel Shilla have been unable to agree on the amount of EBITDA, and therefore are unable to agree on the amount of the earnout.  Hotel Shilla has unambiguously shown that it will not arbitrate.

4.      The procedure for arbitrating the amount of the earnout under these circumstances is specified by the Securities Subscription Agreement, which designates Ernst & Young as the arbitrator.  Ernst & Young requires that the parties sign its engagement letter in order to proceed with the arbitration, and 3Sixty has made clear to Hotel Shilla that it is prepared to proceed and has executed the Ernst & Young engagement letter.  But Hotel Shilla has refused to sign the Ernst & Young engagement letter and taken the position that it "will not agree" to Ernst & Young's engagement letter unless it is permitted to add provisions that effectively rewrite the Securities Subscription Agreement under the guise of edits to the letter.

5.      The parties are thus at an impasse.  3Sixty therefore brings this petition to compel Hotel Shilla to arbitrate the dispute pursuant to the mandatory arbitration provision set forth in the Agreement, or, in the alternative, execute Ernst & Young's engagement letter.

## PARTIES

6.      Petitioner 3Sixty Duty Free & More Holdings, LLC is a Delaware limited liability company with its principal place of business at 555 NE 185th Street, Miami, FL 33179.  3Sixty is a citizen of Florida and Korea.

7.      Respondent Hotel Shilla Co., Ltd. is a foreign corporation incorporated in the Republic of Korea, with its principal place of business located at 234, Dongho-ro, Jung-gu, Seoul,

04606, Republic of Korea.  Hotel Shilla is a citizen of the Republic of Korea.  Hotel Shilla is affiliated with the Korean conglomerate Samsung.

### JURISDICTION AND VENUE

8.      This Court has subject-matter jurisdiction under 9 U.S.C. § 203, which provides that the district courts of the United States shall have original jurisdiction over actions or proceedings falling under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (also known as the "New York Convention").  This action falls under the New York Convention because the arbitration agreement is part of a commercial agreement, petitioner 3Sixty is a citizen of the United States and Korea, and respondent Hotel Shilla is a citizen of Korea.  *See* 9 U.S.C. § 202.

9.      This Court has personal jurisdiction over respondent because, in Section 13.17 of the Securities Subscription Agreement (Ex. 1), respondent submitted to the jurisdiction of the federal and state courts in New York City.  This Court also has personal jurisdiction over respondent under New York's long-arm statute, N.Y. CPLR 302(a)(1), because respondent has transacted business in New York.  Among other things, respondent executed the Securities Subscription Agreement, which is governed by New York law and provides for disputes to be resolved in New York, and has requested petitioner to arrange for arbitration by Ernst & Young in New York.

10.     Venue is proper in this Court because "save for the arbitration agreement an action or proceeding with respect to the controversy between the parties could be brought" in this Court. 9 U.S.C. § 204.  In addition, in Section 13.17 of the Securities Subscription Agreement, respondent waived any objection to venue of any suit relating to the agreements in the federal and state courts

of New York City.

## BACKGROUND

**A.      The Securities Subscription Agreement and the earnout mechanism.**

11.     On October 25, 2019, Hotel Shilla and Travel Retail Group Holdings, LLC, which was subsequently renamed 3Sixty Duty Free & More Holdings, LLC, entered into the Securities Subscription Agreement.  As of the time of entry into the Agreement, the existing members of 3Sixty were two entities affiliated with Bernard Klepach, 3Sixty's founder and CEO:  the Bernard Klepach Granter-Retained Annuity Trust (the "Klepach GRAT") and Klepach 3Sixty Holdings, LLC ("K3H").  Both of these members were also parties to the Agreement.

12.     The interests in 3Sixty originally held by the Klepach GRAT are currently held by Isaac Mitrani as Trustee of (a) The Celine A. Klepach Exempt Trust for Grandchildren Article 4 of the BK 2020 Irrevocable Trust Agreement (the "CK Trust"), (b) The Arielle F. Klepach Exempt Trust for Grandchildren Article 4 of the BK 2020 Irrevocable Trust Agreement (the "AK Trust"), (c) The Julius B. Klepach Exempt Trust for Grandchildren Article 4 of the BK 2020 Irrevocable Trust Agreement (the "JK Trust") and (d) The Bernard Klepach GRAT Continuation Trust under Article 2 of the BK 2020 Irrevocable Trust Agreement (the "BK Trust" and, together with the CK Trust, AK Trust and JK Trust, the "Current Trust Members").  The trustee and each of the beneficiaries of the Current Trust Members are all citizens of the United States residing in the State of Florida.  K3H and the Current Trust Members are hereafter referred to collectively as the "Klepach Members."

13.     Under Section 2.1 of the Agreement, 3Sixty (defined in the Agreement as "the Company") would issue 44 units of membership interests in 3Sixty to Hotel Shilla, comprising 4.4 voting units and 39.6 non-voting units and representing 44% of the voting, economic and ownership interests in 3Sixty.  The Klepach GRAT and K3H retained the remaining 56% of the

membership interests in 3Sixty.  The parties simultaneously entered into an Operating Agreement to govern 3Sixty.

14.    Section 4.10 of the Securities Subscription Agreement provided that the price paid by Shilla for its membership interests would then be dividended by 3Sixty to the two existing members.  The issuance of membership units was contingent on the satisfaction of various closing conditions and the original "outside date" of the transaction, at which point either party could abandon the deal, was April 25, 2020.  SSA § 11.1(b)(ii).

15.    In early 2020, the COVID pandemic hit, and the parties renegotiated the terms of the transaction in an Amendment to the Securities Subscription Agreement, dated March 17, 2020. Ex. 2.  The initial purchase price for the 44% of the membership units was reduced, with the balance of the purchase price to be paid through an earnout mechanism detailed in Section 3 of the Amendment, which added a new Section 2.6 to the Securities Subscription Agreement.  The amount of the earnout payment turns on 3Sixty's EBITDA in either 2021 or 2022 (at the election of 3Sixty).

16.    The earnout section contains a standard dispute resolution mechanism.  New Section 2.6(b) of the Securities Subscription Agreement provides that five days after 3Sixty received its audited financial statements for the year it selected (which was, in this case, 2022), 3Sixty was to prepare and deliver to Hotel Shilla an "EBITDA Earn-Out Payment Statement," which would set forth 3Sixty's EBITDA for that year.  EBITDA was defined under a formula in Section 2.2 of 3Sixty's Operating Agreement.  The EBITDA Earn-Out Payment Statement had to quantify "each component used in the calculation" of the selected year's EBITDA and be accompanied by supporting documentation.

17.    Under new Section 2.6(c), after receiving the EBITDA Earn-Out Payment

Statement, Hotel Shilla had the option of either accepting it and paying whatever earnout was required, or disputing it.  To dispute the proposed earnout calculation, Hotel Shilla was required to send 3Sixty an EBITDA Earn-Out Dispute Payment Notice within 20 days.

18.    New Section 2.6(d) of the Securities Subscription Agreement specifies that in the event Hotel Shilla provided such a dispute notice, the parties were then to use "diligent good faith efforts" to resolve their dispute.  If they could not do so within 20 days, 3Sixty and Hotel Shilla were required to arbitrate the dispute before an "Independent Accounting Firm."  The Amendment set out the process as follows:

> If [the Company and Subscriber, *i.e.*, 3Sixty and Hotel Shilla] are unable to resolve the dispute within twenty (20) days after the delivery of the EBITDA Earn-Out Payment Dispute Notice, then such dispute shall be resolved by the Independent Accounting Firm, and such determination shall be made within twenty (20) days of the submission of the dispute to the Independent Accounting Firm and shall be final and binding on the parties hereof.  The prevailing party in any dispute arising from the EBITDA Earn-Out Payment Dispute Notice shall be entitled to recover its attorney's fees and costs and the costs of engaging the Independent Accounting Firm from the non-prevailing party.

19.    The Independent Accounting Firm is defined in Section 1.1 of the Securities Subscription Agreement as Ernst & Young, unless Ernst & Young is unable or unwilling to serve, in which case the parties would select another firm.

**B.    The parties exchange proposed earnout calculations and begin the process of retaining Ernst & Young.**

20.    Consistent with this mechanism, on May 20, 2023, five business days after the Company received its audited financial statements for 2022, 3Sixty provided to Hotel Shilla an EBITDA Earn-Out Payment Statement showing EBITDA in an amount that entitled 3Sixty to the full earnout payment.  Ex. 3.  It also produced appropriate supporting documentation.

21.    In late May, 3Sixty's counsel contacted Ernst & Young's Miami office, where 3Sixty is headquartered and which the Securities Subscription Agreement designated as the situs

for arbitration for matters unrelated to the earnout, to ask Ernst & Young to serve as an arbitrator if necessary.  Ex. 4; *see* SSA §§ 1.1, 2.6 (Ex. 2).  Ernst & Young agreed and on May 31 sent 3Sixty's counsel a draft engagement letter.  Ex. 5.  3Sixty's counsel then proposed changes to ensure the letter conformed to the Securities Subscription Agreement, in particular deleting Ernst & Young's lengthy proposed schedule, which was inconsistent with the 20-day dispute resolution required by Section 2.6 of the Agreement.  3Sixty's counsel substituted in its place a provision stating: "the Arbiter will advise the Clients of the schedule to be followed for submissions consistent with the terms of the Purchase Agreement." *Id.*  3Sixty's counsel forwarded the draft engagement letter, with some minor revisions approved by Ernst & Young, to Hotel Shilla on June 4.  Ex. 4.

22.    On June 8, counsel for Hotel Shilla responded "Thank you for lia[i]sing with E&Y in the very early stage." *Id.*  Hotel Shilla's counsel suggested, however, that the arbitrator be "selected from [an] E&Y branch office located outside Florida," and proposed that the parties instead use Ernst & Young's New York office, "[t]o align with the governing law and the venue under the SSA." *Id.*  Hotel Shilla's counsel did not raise any other concerns with the draft engagement letter.

23.    On June 9, Hotel Shilla sent to 3Sixty an EBITDA Earn-Out Payment Dispute Notice (Ex. 6), which more than *halved* 3Sixty's proposed EBITDA, to an amount that would result in Hotel Shilla making no earnout payment. *Id.*  The chief purported justification for this change was that Hotel Shilla recharacterized much of the income that 3Sixty had received in 2022 as extraordinary gains not to be included in the calculation of EBITDA. *Id.*

24.    On June 14, 3Sixty's counsel responded to Hotel Shilla's demand to move the arbitration to New York.  Ex. 4.  Counsel noted that the Securities Subscription Agreement did not

provide for arbitration in New York, and that Miami was the more logical and less expensive venue, as 3Sixty was based in Miami. *Id.* Nevertheless, to settle this minor dispute, 3Sixty agreed to have the arbitration take place in New York, and requested a new engagement letter from Ernst & Young. *Id.* Ernst & Young issued the new engagement letter the same day and 3Sixty executed it on June 15. Ex. 7.

**C.     The parties are unable to resolve their disputes and Hotel Shilla refuses to arbitrate.**

25.     The parties and their counsel arranged a meeting in Los Angeles to discuss the earnout payment in the week of Monday, June 17. Two days before, 3Sixty's counsel asked Hotel Shilla's outside counsel whether Hotel Shilla would be executing the engagement letter, while simultaneously noting that he hoped the letter would not be needed "because this will be amicably resolved." Ex. 8. Hotel Shilla's counsel responded that he was "not sure exactly when Shilla is planning to sign [] E&Y's engagement," but that it was not necessary to do so before the meeting because the parties had 20 days from June 9 to resolve the issues. *Id.*

26.     The meeting in Los Angeles was not successful. On June 27 — with the 20-day dispute resolution period nearly over — 3Sixty followed up with Hotel Shilla about the engagement letter. *Id.* For the first time, Hotel Shilla proposed substantive changes to the engagement letter. *Id.* These were entirely inconsistent with the Securities Subscription Agreement.

27.     *First*, Hotel Shilla improperly attempted to limit the scope of Ernst & Young's work. The Securities Subscription Agreement had two complementary dispute resolution mechanisms. A dispute under the EBITDA Earn-Out Payment Dispute Notice submitted by Hotel Shilla was to be decided by the Independent Accounting Firm under the mechanism set out in Section 2.6. SSA § 2.6 (Ex. 2). On the other hand, any *other* disputes under the Securities

Subscription Agreement were to be resolved through non-binding arbitration in Florida and litigation in New York.  SSA §§ 13.16, 13.17.

28.    Despite the clear demarcation between the two, Hotel Shilla sought to insert into the engagement letter a provision that would effectively allow it to withdraw earnout-related disputes from Ernst & Young and bring them instead in litigation.  Specifically, Hotel Shilla demanded that the "Disputed Items" to be addressed by Ernst & Young "exclude any items challenged by either Party through other legal dispute resolution means (i.e. non-binding legal arbitration)."  Ex. 8.  Hotel Shilla's language continued:  "For the avoidance of doubt, any items indicated by either Party as 'legal claims' shall not be decided by the [independent accountant] and shall be deferred to a legal arbitrator."  *Id.*  This language, contrary to the plain text of the Securities Subscription Agreement, would have allowed Hotel Shilla to designate *any* aspect of the earnout calculation as a "legal claim" that would have to be resolved in non-binding arbitration followed by litigation.  The addition would have nullified the earnout dispute resolution mechanism, the point of which was to allow disputes concerning the earnout to be decided quickly.

29.    *Second*, Hotel Shilla demanded that 3Sixty pay the entire cost of the arbitration and that Hotel Shilla pay none.  *Id.*  This position has no basis in the text of the Securities Subscription Agreement, which provided that the arbitration would be between 3Sixty and Hotel Shilla.  SSA § 2.6 (Ex. 2).  As articulated later, Hotel Shilla's concern was apparently that even if 3Sixty bore all the costs directly, Hotel Shilla would bear 44% of them indirectly through its ownership in 3Sixty.  *See* Ex. 9.  But the parties had not bargained to split the costs in this way, even though the

effect of splitting fees equally was obvious at the time Hotel Shilla agreed to and executed the Amendment to the Securities Subscription Agreement.

30.    *Third*, Hotel Shilla attempted to rewrite the fee-shifting provision that *did* exist. Section 2.6(d) provided that "[t]he prevailing party in any dispute arising from the EBITDA Earn-Out Payment Dispute Notice shall be entitled to recover its attorney's fees and costs and the costs of engaging the Independent Accounting Firm from the non-prevailing party."  Ex. 2.  This provision clearly stated that attorneys' fees and costs were to be paid to the prevailing party (either 3Sixty or Hotel Shilla) by the non-prevailing party.  But Hotel Shilla speculated that "[i]t might not be clear which party would be a 'prevailing party'" and proposed that fees be shared between "Shilla and Mr. Klepach (the Members) in proportion to the shareholding ratio, i.e. 44% and 56%, respectively."  Ex. 8.  Yet the Securities Subscription Agreement made clear that the arbitration was between Hotel Shilla and 3Sixty, *not* Hotel Shilla and the Klepach Members.  *E.g.*, SSA § 2.6(d) (Ex. 2) (noting that the dispute was between "the Company [*i.e.*, 3Sixty] and the Subscriber [*i.e.*, Hotel Shilla]."  Hotel Shilla's proposed changes regarding the prevailing party, in seeking to reduce the fees it will have to pay if the arbitrator finds in favor of 3Sixty, implicitly recognizes the weakness of its objections to the Company's EBITDA calculations.

31.    Counsel for 3Sixty responded the same day, pointing out that "Shilla's proposed modifications actually seek to modify the terms of the Securities Subscription Agreement as modified by the Amendment" and that "[t]here is no reason to amend the SSA."  *Id.*  3Sixty further pointed out that Hotel Shilla was "obligated, pursuant to the SSA, to sign the engagement letter

and proceed with the arbitration," and requested that Hotel Shilla sign it by July 7 — one month

after it had been provided by Ernst & Young in New York at Hotel Shilla's request.

32.    On July 7, outside counsel for Hotel Shilla responded.  Hotel Shilla conceded both

that the parties had only 20 days to resolve their disputes and that Ernst & Young, once the dispute

was submitted, had to render a decision within 20 days.  Ex. 9.  But counsel for Hotel Shilla

claimed that "the SSA is silent on the timeline for retaining E&Y and for the parties' submitting

the dispute to E&Y" — as if the parties had expected that those events would not happen

immediately.  *Id.*  Hotel Shilla therefore refused to execute the engagement letter.

33.    Counsel for Hotel Shilla proceeded to claim that there were "numerous issues" with

the engagement letter to be resolved.  *Id.*  Hotel Shilla sent back a lengthy mark-up of the

engagement letter, which proposed changes that went beyond even what it had proposed on June

27.  Contrary to the terms of the Agreement, Hotel Shilla's changes made the Klepach Members

parties to the engagement letter.  *Id.*  Hotel Shilla now proposed, contrary to its earlier suggestion,

that the fees and costs of the arbitration be split 50/50 between Hotel Shilla and the Klepach

Members.  Hotel Shilla bluntly stated that it would not "agree to any engagement letter that

requires it to bear a greater portion of E&Y's fees and expenses than the Klepach Members" —

even though this was exactly what it had agreed in the Amendment to the Securities Subscription

Agreement.  *Id.*

34.    Hotel Shilla also suggested a new formula for determining who would be the

prevailing party — again, contrary to the plain text of the Agreement but also its previous position.

Hotel Shilla proposed a timetable for the arbitration lasting several months, even though the

earnout dispute mechanism required that the Independent Accounting Firm resolve the dispute in

twenty days.  And, Hotel Shilla sought to insert descriptions of disputed items and EBITDA into

the engagement letter, thus preventing Ernst & Young from fulfilling its duty to interpret these issues, as arbitrator, for itself. *Id.*

35.    Finally, Hotel Shilla complained for the first time that counsel for 3Sixty had engaged in improper "ex parte" communications with Ernst & Young. *Id.*

36.    Counsel for 3Sixty replied on July 17, 2023.  Ex. 10.  3Sixty pointed out that "[u]nder Section 3(d) of the March 17, 2020 Amendment to the SSA, the dispute to be resolved is between the Company and the Subscriber." *Id.*  There was no basis to "allocate[e] costs to . . . other parties," and it was inappropriate that Hotel Shilla was attempting to renegotiate the Securities Subscription Agreement now.  3Sixty also objected to Hotel Shilla's attempts to define the "disputed issues," the scope of EBITDA, and the meaning of "prevailing party."  Finally, counsel for 3Sixty refuted the claim that 3Sixty had engaged in improper *ex parte* communications with Ernst & Young:  rather, counsel had contacted Ernst & Young to arrange the engagement and conformed Ernst & Young's letter to the Securities Subscription Agreement. *See id.*; Ex. 5 (showing conforming edits).  Indeed, Hotel Shilla had previously *thanked* him for taking the initiative of contacting Ernst & Young.  Ex. 4.  As to the merits of the dispute, counsel for 3Sixty noted that it appeared from Hotel Shilla's letter, as it had from the meeting in Los Angeles, that Hotel Shilla would be withdrawing certain of the objections that it made in its EBITDA Earn-Out Payment Dispute Notice.  3Sixty requested that Hotel Shilla inform 3Sixty which of its objections it would be withdrawing by Friday, July 21.

37.    Hotel Shilla responded on July 21.  Ex. 11.  Hotel Shilla ignored that the letter it had received on July 17 came from 3Sixty and treated it as coming from the "Klepach Parties." *Id.* (Previously, Hotel Shilla had acknowledged that it was corresponding with 3Sixty. *E.g.*, Ex. 9.)  Hotel Shilla accused the Klepach Members of *ex parte* communications with Ernst & Young,

claimed again that the Klepach Members should be compelled to sign the engagement letter, and demanded that Hotel Shilla and the Klepach Members split the costs of the proceeding. Ex. 11. Hotel Shilla again demanded that the parties agree in advance to a definition of "prevailing party," that they adopt a lengthy schedule for the arbitration, and that they stipulate in advance to what the issues to be resolved should be. *Id.* Hotel Shilla thus refused to compromise its previous position in any way.

38.     On July 25, counsel for 3Sixty spoke by telephone with counsel for Hotel Shilla. *See* Ex. 12. The call did not "close the gap on any of the open issues," but counsel for 3Sixty expressed his hope that the two sides might still be able to make progress. *Id.* As counsel for 3Sixty pointed out, had the parties arbitrated promptly, Ernst & Young would have rendered a decision by then. *Id.*

39.     With the parties now deadlocked, and with a resolution of this matter long overdue, 3Sixty is left with no choice but to file this motion to compel arbitration.

## ARGUMENT

**I.     Section 2.6(d) of the Agreement creates an enforceable agreement to arbitrate.**

40.     The earnout dispute resolution provision in the Agreement is governed by the Federal Arbitration Act. 9 U.S.C. § 1 *et seq*.; *see, e.g.*, *Allied-Bruce Terminix Cos.* v. *Dobson*, 513 U.S. 265, 273-74 (1995) (FAA applies to all arbitration agreements affecting commerce). The Securities Subscription Agreement provides that it "shall be construed in accordance with, and governed in all respects by, the internal laws of the State of New York." SSA § 13.15. Because this language does not provide that the Agreement will be *enforced* in accordance with New York law, the procedural provisions of the FAA apply rather than those found in the arbitration

provisions of the New York CPLR.[1]

41.    In analyzing a petition to compel arbitration, a court must determine (1) "whether a valid agreement or obligation to arbitrate exists," and (2) "whether one party to the agreement has failed, neglected or refused to arbitrate." *Shaw Group Inc.* v. *TripleFine Int'l Corp.*, 322 F.3d 115, 120 (2d Cir. 2003).

42.    There is no question that a valid agreement to arbitrate exists. *See, e.g.*, *Eitan* v. *Aterian, Inc.*, No. 2023 WL 3569363, at *5 (S.D.N.Y. May 18, 2023) (holding that a similar contract term, providing for resolution of an earnout dispute by an accountant, constituted an enforceable arbitration clause). Moreover, Hotel Shilla has consistently acknowledged that it is required to arbitrate the earnout dispute if the parties are unable to reach a resolution. *E.g.*, Exxs. 4, 8. Therefore, the only question is whether Hotel Shilla has "failed, neglected, or refused to arbitrate."

## II.    Hotel Shilla has refused to arbitrate.

43.    A party may seek to compel arbitration "when the respondent unequivocally refuses to arbitrate, either by failing to comply with an arbitration demand or by otherwise unambiguously manifesting an intention not to arbitrate the subject matter of the dispute." *LAIF X SPRL* v. *Axtel, S.A. de C.V.*, 390 F.3d 194, 198 (2d Cir. 2004). Here, Hotel Shilla has unambiguously manifested its intention not to arbitrate. Hotel Shilla has repeatedly stated that it will *not* arbitrate unless the Klepach Members are forced to join as parties. Exxs. 9, 11.

---

[1] *See, e.g.*, *Penrod Mgmt. Grp.* v. *Stewart's Mobile Concepts, Ltd.*, 2008 WL 463720, at *2 (S.D.N.Y. Feb. 19, 2008) (procedural rules of FAA apply "in the absence of more critical language concerning enforcement"). There is in any event only a minimal difference between the relevant provisions of the FAA and the CPLR. *Compare* 9 U.S.C. § 4 (provision for compelling arbitration) *with* N.Y. CPLR § 7503 (similar); *compare also* 9 U.S.C. § 5 (provision for appointing arbitrators) *with* N.Y. CPLR § 7504 (similar).

44.     But the earnout arbitration provision clearly provides that the arbitration is between *3Sixty* and *Hotel Shilla*.  It is "***the Company***," not the Klepach Members, that prepares the EBITDA Earn-Out Payment Statement and sends it to Hotel Shilla.  SSA § 2.6 (Ex. 2) (emphasis added).  Then, "[i]n the event that the Subscriber disputes ***the Company's*** determination of the EBITDA Earn-Out Payment, the Subscriber shall so notify ***the Company*** by delivering a written notice . . . to ***the Company***."  *Id.* (emphasis added).  Again, this provision does not mention the Klepach Members.  Then, and as quoted above, "[i]f the Subscriber timely delivers to the ***Company*** an EBITDA Earn-Out Payment Dispute Notice in accordance with Section 2.6(b), ***the Company and the Subscriber*** shall first use diligent good faith efforts to resolve such dispute between them" (emphasis added).  Section 2.6 continues:  "If ***they***" — referring to 3Sixty and Hotel Shilla — "are unable to resolve the dispute within twenty (20) days after the delivery of the EBITDA Earn-Out Payment Dispute Notice, then such dispute shall be resolved by the Independent Accounting Firm" (emphasis added).

45.     The arbitration is thus between 3Sixty and Hotel Shilla, and Hotel Shilla cannot rewrite the contract to make it between the Klepach Members and Hotel Shilla.  "Courts must rigorously enforce arbitration agreements according to their terms."  *Am. Express Co.* v. *Italian Colors Rest.*, 570 U.S. 228, 233 (2013).  By stating that it will not abide by the plain terms of the arbitration provision, and therefore refusing to sign the engagement letter, Hotel Shilla has "unambiguously manifest[ed] an intention not to arbitrate the subject matter of the dispute."  *Cf. Eitan*, 2023 WL 3569363 (granting motion to compel arbitration where respondent insisted on an engagement letter that was inconsistent with the arbitration provision).[2]

---

[2] Hotel Shilla's principal reason for demanding that the Klepach Members arbitrate appears to be to force them, rather than the 3Sixty, to pick up the cost for the dispute.  *E.g.*, Ex. 11.  Hotel Shilla

46.     Hotel Shilla's other objections to the proposed engagement letter also manifest its refusal to arbitrate. Hotel Shilla has sought to rewrite the definition of "prevailing party" so that costs and fees would be payable by the Klepach Members, not by 3Sixty, as the arbitration provision requires. Hotel Shilla has attempted to rewrite and limit the scope of the issues for the arbitrator to decide in the earnout dispute through proposed changes in the Ernst & Young engagement letter: this would allow Hotel Shilla to carve out and pursue earnout claims in a forum it believes would be more favorable and strip the arbitrator of its authority to decide the scope of the arbitration. Hotel Shilla also extended the timetable for the arbitration by several months even though the Subscription Agreement requires summary proceedings that conclude in twenty days.

47.     More generally, all of Hotel Shilla's conduct concerning Ernst & Young's engagement evinces bad faith. Hotel Shilla originally thanked 3Sixty for obtaining the engagement letter and only asked that it be issued by a different office. Then, Hotel Shilla made ever-changing objections to its content, culminating in an unwarranted *attack* on 3Sixty for obtaining it and refusing to sign it unless it was inconsistent with the Subscription Agreement. All of this is far more than courts have previously held constitutes a manifest refusal to arbitrate. *See, e.g.*, *Eitan*, 2023 WL 3569363 (granting motion to compel arbitration where respondent improperly sought to define dispute in engagement letter).

### III.     In the alternative, the Court should appoint an arbitrator.

48.     In the alternative, the Court may appoint an arbitrator under 9 U.S.C. § 5. Section 5 of the FAA provides that if an agreement provides a method for appointing an arbitrator and "any party thereto shall fail to avail himself of such method, or if for any other reason there shall

---

has also speculated that the Klepach Members intend to challenge the results of the arbitration in a different forum themselves. *Id.* This is entirely false.

be a lapse in the naming of an arbitrator . . . then upon the application of either party to the controversy the court shall designate and appoint an arbitrator." This provision is routinely invoked where, as here, one party refuses to cooperate in appointing an arbitrator. *See, e.g.*, *Odyssey Reins. Co.* v. *Certain Underwriters at Lloyd's London*, 615 F. App'x 22, 23 (2d Cir. 2015). In this case, Hotel Shilla has stated that it will *not* agree to execute any engagement letter with Ernst & Young that reflects the Securities Subscription Agreement. Therefore, it is appropriate for the Court to appoint Ernst & Young as arbitrator, acting subject to the standard-form engagement letter that was agreed with 3Sixty and provided to Hotel Shilla for review and execution.

## REQUEST FOR RELIEF

WHEREFORE, Petitioner respectfully requests that the Court enter the following relief:

a.    Issuance of an order, pursuant to 9 U.S.C. § 4 and the mandatory arbitration agreement contained in the Securities Subscription Agreement entered into by the parties, compelling Respondent Hotel Shilla to sign the Ernst & Young engagement letter as is, and arbitrate before the Independent Accounting Firm of Ernst & Young the dispute concerning the calculation and issuance of the Earn-Out Payment;

b.    In the alternative, issuance of an order appointing Ernst & Young as an arbitrator for the parties' dispute, pursuant to 9 U.S.C. § 5;

c.    Awarding petitioner its attorneys' fees and costs as the prevailing party in this action; and

d.    Awarding petitioner such other and further relief as the Court deems just and proper.

Dated:  July 28, 2023

Respectfully submitted,

*/s/ Meir Feder*

Meir Feder
Nicholas Walter
Jacob Miller
JONES DAY
250 Vesey St.
New York, NY 10281
Tel:  (212) 326-3939
mfeder@JonesDay.com
ncewalter@JonesDay.com
jakemiller@JonesDay.com

*Attorneys for Petitioner*
*3Sixty Duty Free & More Holdings, LLC*